FILED _____ ENTERED
_____ LODGED _____ RECEIVED

OCT 0 4 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

KSC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE APPLICATION        )
OF THE UNITED STATES OF AMERICA         )
FOR SEARCH WARRANTS FOR THE             )     CASE NO. **13-2261 TJS**
SUBJECT LOCATIONS AND THE               )                   *thru*
SUBJECT CELLULAR PHONE                  )     **13-2265 TJS**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Special Agent ("S/A") Troy Yeager of the US Department of Health & Human Services, Office of Inspector General, being of lawful age and first duly sworn upon my oath, states as follows:

1.      This affidavit is made in support of applications for search warrants for the following:

- Dr. John Yacoub's residence located at 729 Charing Terrace, Towson, MD 21204, which is more fully described in the attached ATTACHMENT A ("Charing Terrace");

- Dr. John Yacoub's medical office located at 6565 N. Charles Street, Suite 416, Towson, MD 21204, which is more fully described in the attached ATTACHMENT B ("N. Charles Street");

- Sandra Martin's residence located at 2211 Sparrows Point Road, Baltimore, MD 21219, which is more fully described in the attached ATTACHMENT C ("Sparrows Point Road," collectively with Charing Terrace and N. Charles Street, the "Subject Locations"); and

- Dr. John Yacoub's cellular telephone, bearing phone number (410) 627-6353, which is more fully described in the attached ATTACHMENT D (the "Subject Cellular Phone").

2.      Based on the information set forth below, your affiant submits that there is probable cause to believe that kept and concealed within the Subject Locations and the Subject Cellular Phone there is evidence of:

- Title 21 U.S.C. § 846 – Conspiracy to Distribute Oxycodone,

Oxymorphone, Morphine, Methadone and Alprazolam and Possess with Intent to Distribute; and

- Title 21 U.S.C. § 842(a)(2) – Improper use of a DEA registration number;

3.      There is further probable cause to believe that the Subject Locations and the Subject Cellular Phone contain contraband, the fruits of the crime, property designed or intended for use and which is and has been used as a means of committing the offense, other evidence of the offense, and those specific items listed in ATTACHMENT E.

4.      The information contained in this affidavit is based on your affiant's personal knowledge and on information provided to him by the Maryland Board of Physicians, DEA Task Force Officers ("TFOs"), DEA S/As and DEA Diversion Investigators, and others involved in this investigation. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on a review of audio recordings and draft transcripts thereof. Because this affidavit is submitted for the limited purpose of establishing probable cause to search the Subject Locations and the Subject Cellular Phone, this affidavit is not intended to include each and every fact related to this investigation.

## YOUR AFFIANT

5.      Your Affiant, S/A E. Troy Yeager, is employed as a S/A with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"). Your Affiant has been a sworn member of HHS-OIG since November 2001 and is currently assigned to the Field Office located in Columbia, MD.

6.      Your Affiant has attained a Bachelor's degree in criminal justice at

Northeastern University.   Your Affiant has successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") and the Inspector General Investigator Training Program at the FLETC.   In February 2008, your affiant completed Continuing Legal Education Training Program at the FLETC.   In April 2009, your Affiant completed National Association of Drug Diversion Investigators Basic Diversion School.

7.     During the course of his career, your Affiant has been involved in numerous investigations pertaining to health care fraud and the diversion of pharmaceutical drugs, ranging from street-level operations to doctors, pharmacists and illicit drug-trafficking organizations.   Your Affiant has participated in the execution of Federal Title III orders.   Your Affiant has arrested and/or participated in the arrest of numerous persons for violations of Federal and state narcotics statutes and/or health care fraud.   Your Affiant has authorized and/or participated in numerous search and seizure warrants relating to violations of Federal and state narcotics statutes and/or health care fraud.   Your Affiant is currently assigned to the Drug Enforcement Administration ("DEA") Tactical Diversion Squad ("TDS").   The DEA-TDS is responsible for enforcing state and federal violations related to the diversion of pharmaceutical narcotics.

8.     In addition, based on my knowledge, training and experience, narcotics traffickers, including those involved in the diversion of pharmaceutical drugs, frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities and frequently maintain numerous such electronic devices in an effort to conceal their activities.   Based upon your affiant's training, experience and participation in this and other narcotics investigations, I know the following:

    a.     Narcotics traffickers, including those involved in the diversion of pharmaceutical drugs, frequently maintain books, ledgers, records and other documents relating to the manufacture, transportation, possession, and distribution of controlled substances. Such documentation is frequently maintained where the traffickers have ready access to it, including their homes, offices and electronic devices such as cellular phones, pages, personal digital assistants ("PDAs"), or "smart" phones.

    b.     Narcotics traffickers, including those involved in the diversion of pharmaceutical drugs, commonly maintain books, records and other documents or items that identify and contain the names, addresses and/or telephone or pager numbers of associates in their narcotics trafficking activities, including, but not limited to cellular telephones, pagers, PDAs, and "smart" phones.

    c.     Narcotics traffickers, including those involved in the diversion of pharmaceutical drugs, often use cellular telephones, pagers, PDAs, or "smart" phones, to conduct their business and to store information such as names, addresses, phone numbers, and logs of narcotics sales.

## DR. JOHN YACOUB

9.     The DEA and HHS-OIG have been conducting an investigation of Dr. Yacoub since July 2013. This investigation was initiated based on information received from Saint Agnes Hospital, where Dr. Yacoub previously worked. Through the course of the investigation, it has been determined that Dr. Yacoub is a Medical Doctor who specializes in obstetrics and gynecology. In addition, Dr. Yacoub operates a self-designed diet program and is certified through DEA to conduct opiate detox.

10.     Dr. Yacoub is currently being investigated by the Maryland Board of Physicians and provided them with the following information on April 19, 2013. Dr. Yacoub graduated medical school at the American University of Beirut in 1982 and did his residency at the Greater Baltimore Medical Center ("GBMC") from 1982 to 1986. Dr. Yacoub is board certified in obstetrics and gynecology and has practiced private medicine since 1986 at GBMC. At GBMC, Dr. Yacoub practiced gynecology with emphasis on laparoscopic gynecology and at the same time, he was running the diet

program and detox program.  Approximately two (2) years ago, Dr. Yacoub was recruited by Saint Agnes Hospital.  For the last two (2) years, Dr. Yacoub practiced at Saint Agnes Hospital where he was the Director of Minimally Invasive Surgery.  In addition, Dr. Yacoub ran the diet and opiate detox programs at Saint Agnes Hospital.  In November of 2012, Saint Agnes Hospital terminated his privileges, his health insurance and his employment.  He has since been renting office space at GBMC.

11.     Dr. Yacoub is licensed in the State of Maryland with license number D30010, by the DEA with registration number AY2410900, and by the DEA to conduct opiate detox with registration number XY2410900.  A DEA registration number gives Dr. Yacoub the authority to order, dispense and handle controlled dangerous substances.  A DEA registration with a Unique Identification Number ("UIN"), in which the first character is replaced with an "X," indicates that a physician is registered as a Data-Waived Physician.  A Data-Waived Physician may administer, dispense, and prescribe buprenorphine controlled substances (Suboxone and Subutex), in a Narcotic Treatment Program ("NTP") or office setting, for the purpose of narcotic addiction.  A Data-Waived Physician may treat up to one-hundred (100) patients based on DEA authorization.

12.     As detailed further below, Dr. Yacoub currently rents a residence located at 729 Charing Terrace, Towson, MD 21204 and rents office space at 6565 N. Charles Street, Suite 416, Towson, MD 21204.  Dr. Yacoub's current cellular telephone number is (410) 627-6353.

## PROBABLE CAUSE

13.     In April 2013, the DEA received a package from the United States Attorney's Office in Baltimore, MD that had been received from legal staff at Saint

Agnes Hospital.  Among other items, the package contained numerous text messages dated January 30, 2012 to October 4, 2012 that Dr. Yacoub had apparently downloaded to his company computer.  In addition, your Affiant and other law enforcement officers participating in the investigation reviewed interviews conducted by the Maryland Board of Physicians, conducted surveillance and trash runs, reviewed pharmacy patient profiles, reviewed telephone toll records and reviewed subpoenaed FedEx documents.  Based on knowledge gathered from the investigation, it is alleged that Dr. Yacoub illegally prescribed and continues to illegally prescribe Schedule II and Schedule IV Controlled Dangerous Substances ("CDS") outside the scope of legitimate medical practice to Windy Manning and Sandra Martin.  In addition, it is alleged that Dr. Yacoub is illegally obtaining prescription medication and other controlled substances for his personal use.

## TERMINOLOGY

14.    Your Affiant knows the following based on his training, knowledge and experience in the investigation of pharmaceutical drug diversion:

- Oxycodone, a Schedule II CDS, is an opioid pain medication used for the treatment of moderate to severe pain.  "Oxy" is a common street term for Oxycodone.

- Opana, a Schedule II CDS, is a brand name for Oxymorphone and it is an opioid pain medication used for the treatment of moderate to severe pain.

- Morphine, a Schedule II CDS, is an opioid pain medication used for the treatment of moderate to severe pain.  "MS" is a common street term for Morphine.

- Methadone, a Schedule II CDS, is an opioid pain medication used for the treatment of moderate to severe pain.  Methadone is also used for drug addiction detoxification.

- Xanax, a Schedule IV CDS, is a brand name for Alprazolam and it is a benzodiazepine used for the treatment of anxiety.  "X" is a common street term for Xanax.

## WINDY MANNING

15.     Based on the information developed during the course of the investigation and detailed further below, Windy Manning was one of the individuals to whom Dr. Yacoub was illegally distributing narcotics.  She is currently living in Sparks, NV, but frequently travels.  She is believed to have used cellular telephone number (757) 331-0516, which is listed in Dr. Yacoub's call log as "Windy."  The text message history obtained from Saint Agnes shows that Manning was using that number to contact Dr. Yacoub.  Law Enforcement was able to positively identify Manning through subpoenaed documents from FedEx and Southwest Airlines.  Detailed below are several of the text message exchanges between Manning and Dr. Yacoub.

16.     For example, on July 26, 2012, the following text messages were sent between Dr. Yacoub ((410) 627-6353) and Windy Manning ((757) 331-0516):

- Manning :     You better beware that when we go pick them up baby Ur in big trouble and I mean it. U better prepare yourself. Id like to do it tonight honey because tomorrow I can't give you kisses because my lips will be messed up. They have Opana 80mg baby and they are magical. [2 sentences redacted] I get in early enough to go to pharmacy right. Thank you honey eeeek Ur gonna love what I have planned mister.

- Dr. Yacoub:  Now I need a cold shower heheeeee

- Manning:     I feel like I haven't been making you happy and I really want to play Baby. Id like to get off the plane and eat a strong Opana pill go to hotel and attack you. I know 5-9 pills is nothing ya know. U just gotta make sure that u write the script perfect. U have to write in my name baby because u have been writing her my m100 so if you could ask her if she will go to the pharmacy w us that would be great. I have something special planned but I feel like death

- Dr. Yacoub:  She knows a pharmacist

- Dr. Yacoub:  Actually I will check with Sandy

- Dr. Yacoub:   I do not trust anybody else baby

- Dr. Yacoub:   I can write it for you!

17.   A few days later, on July 30, 2013, the following text messages were sent

between Dr. Yacoub ((410) 627-6353) and Windy Manning ((757) 331-0516):

- Manning:   Baby when u write my script please just write it for Morphine
  Sulfate IR 30mg.  That way I am not filling the 60er again.  So it
  looks like were trying different medications pretty please with
  sugar on top and a cherry lol!!! Plus its Instant Release I miss u so
  much already. Kisses xoxoxoxo

- Dr. Yacoub:   Baby you are.  200 percocet correct.  I love you the mostest !!!!

- Manning:   Im exhausted and really upset.  Beyond hurt and upset.  Im going
  to be baby.  Just remember when writing my new script to copy
  down the new Morphine I found.  I know its only 30mg but I don't
  want to fill 60mg again.  Thank u so much whenever u leave bank
  just Lmk.  Wish I didn't have to come home to even more
  problems caused by Jolina."

- Dr. Yacoub:   Will fed ex 2 scripts one with date one without

- Dr. Yacoub:   Will send her stuff tomorrow and go to bank tomorrow I will still
  fed ex script for you

- Dr. Yacoub:   What dose of ms baby?

- Dr. Yacoub:   Baby ??  I have fifteen mins to make it to FedEx

- Dr. Yacoub:   I am gonna write 2 scripts then

- Manning:   Baby its 30mg IR

- Dr. Yacoub:   K thanks

- Manning:   I sent u all the info yesterday.  Remember silly goose.  I will fill
  that onto tomorrow and the other when Ur here.  Unless u can get
  Sandy to get the oxy 80

- Dr. Yacoub:   Sending you both just in case

18.   Your Affiant reviewed subpoenaed FedEx documents, which indicate that

on July 30, 2012, Dr. John Yacoub, 1001 Pine Heights Ave, STE 203, Baltimore, MD

21229 shipped a FedEx package to Morning Windy, 29 Montelago Blvd, 54 Oluna,

Henderson, ND 89011, and the package was received on July 31, 2012, at 8:14 a.m.

    19.    On August 7, 2012, the following text messages were sent between Dr.

Yacoub ((410) 627-6353) and Windy Manning ((757) 331-0516):

- Manning:    Hi baby I was up sick all night please send whatever u can today.
  I'm praying Sandy wont do what she did yesterday

- Dr. Yacoub:    Baby I am sending you 2 oxy and some shotties bottle I am not
  supposed to do that by I don't care.  Sandy will bring script on
  Wednesday I also found 2 pills I do not recognize will send them
  too.  Love you

    20.    Your Affiant reviewed subpoenaed FedEx documents, which indicate that

on August 7, 2012, Dr. John Yacoub, 1001 Pine Heights Ave, STE 203, Baltimore, MD

21229 shipped a FedEx package to Windy Manning, 29 Montelago Blvd, 54 Oluna,

Henderson, ND 89011, and the package was received on August 8, 2012 at 9:54AM.

    21.    On August 28, 2012, the following text messages were sent between Dr.

Yacoub (410) 627-6353 and Windy Manning (757) 331-0516:

- Manning:    Will you call Walgreens baby please?? Love you more.  Baby
  what it's an excuse I can use for cody being this late? Going.to
  write him a more.  Car problems

- Dr. Yacoub:    Baby we will fill them today and fax them if you are up to it  Your
  call

- Manning:    Okay baby

- Manning:    Oxymorons 30Mg #26

- Manning:    Oxycodone lol

- Dr. Yacoub:    Yeah

- Manning:    Love you

- Dr. Yacoub:   Love youuuuu

- Dr. Yacoub:   Called pharmacy I forgot to write date.  Should be ready soon

22.     Your Affiant reviewed pharmacy records from Walgreens Pharmacy and determined that on August 28, 2012 a prescription was filled in the name Windy Manning for twenty-six (26) tablets of Oxycodone 30mg, which was prescribed by Dr. Yacoub.

23.     On two (2) occasions, April 19, 2013 and July 1, 2013, the Maryland Board of Physicians interviewed Dr. Yacoub.   The interviews were recorded and transcribed.  On both occasions, Dr. Yacoub was questioned about Manning.  On April 19, 2013, Dr. Yacoub explained, in part:

Question:      Okay.  What is your relationship with Wendy Manning?

Answer:        She is a patient of detox, and we, you know – we became kind of pal friends, if you like.  There is no sexual or physical relationship if that's the question you ask me.

Question:      That is the question I'm asking

Answer:        No, ma'am, there was no sex for drugs in any form or fashion.

### SANDRA MARTIN

24.     Based on the information developed during the course of the investigation and detailed further below, Sandra Martin is currently living at 2211 Sparrows Point Road, Baltimore, MD 21219.  She is believed to have used cellular telephone number (443) 226-8330, which is listed in Dr. Yacoub's call log as "SandyCellNew."  Telephone number (443) 226-8330 is subscribed to an unknown subscriber.  However, the email address sandramartin675@gmail.com is associated with the account.  Law Enforcement was able to positively identify Martin through the use of law enforcement databases.  The

information from the databases indicates that on July 13, 2013 and January 14, 2013 Sandra K. Martin pawned items in Baltimore County, Maryland and provided the following information: DOB: 02/17/1953, Address: 2211 Sparrows Point Road, Baltimore, MD 21219, Phone number: (443) 226-8330. Based on the history of text messages obtained from Saint Agnes, Martin was using that number to contact Dr. Yacoub. Detailed below are several of the text message exchanges between Martin and Dr. Yacoub.

25.     On August 20, 2012, the following text messages were sent between Dr. Yacoub ((410) 627-6353) and Sandra Martin ((443) 226-8330):

- Martin:        Have r paint did any X's come in LUV U ME Sandra Martin

- Martin:        Have you heard anything yet Sandra Martin

- Dr. Yacoub:   Yes it was shipped fridY IT WILL BE HERE TOMORROW definetly I can see you tonight or tomorrow

- Martin:        I have to pay for the paint and I have to get my prescriptions what time can I see you Sandra Martin

- Dr. Yacoub:   how about 6 30 usual place

26.     On August 21, 2012, the following text messages were sent between Dr. Yacoub ((410) 627-6353) and Sandra Martin ((443) 226-8330):

- Martin:        Drop Wendy's script off should be there 8 or 8:30 good for u LUV U ME Sandra martin

- Dr. Yacoub:   Cool just text me when close

- Martin:        Be there at 9:30 Sandra Martin

27.     On August 22, 2012, the following text messages were sent between Dr. Yacoub ((410) 627-6353) and Sandra Martin ((443) 226-8330):

- Martin:      Got wendys prescription filled what time do you want to meet you by love you me Sandra Martin

28.     On August 28, 2012, the following text messages were sent between Dr.

Yacoub ((410) 627-6353) and Sandra Martin ((443) 226-8330):

- Dr. Yacoub:   Hi I am leaving Thursday till Monday any Oxy or do you need anything?

- Martin:       will see you tomorrow around 630 will try to get some oxy for you

## PERSONAL USE

29.     On June 20, 2013 and August 27, 2013, the Maryland Board of Physicians

drug tested Dr. Yacoub.  On June 20, 2013, Dr. Yacoub tested positive for cocaine.  On

July 1, 2013, the Maryland Board of Physicians interviewed Dr. Yacoub regarding his

positive drug test, which was recorded and transcribed.  On July 1, 2013, Dr. Yacoub

provided the following in part:

Question:    Have you ever used illicit drugs before?

Answer:      No, ma'am

Question:    Can you explain your positive result test for cocaine?

Answer:      No, I've used phentermine

Question:    Have you ever used cocaine or any illicit drugs?

Answer:      No, maybe on New Year there was some cocaine out, but I didn't use it.

Question:    So, are you saying that you have never used cocaine?

Answer:      Not myself, no.

Question:    You mention that you may have been exposed to cocaine, perhaps, maybe as far back as New Year's Eve

Answer:      Yes, that's the only time I've been around cocaine

Page | 12

| Question: | What was the scenario?  What was that situation and how were you in close proximity? |
|---|---|
| Answer: | Well I was not in Baltimore; I was in Las Vegas at the time and the person that I was with put cocaine on my organ to delay ejaculation.  That's the only time. |
| Question: | You've never ingested it nasally? |
| Answer: | No, sir. |
| Question: | Never ingested it IV? |
| Answer: | No, I'm a busy physician and I have the OR first thing in the morning, but, you know. |

30.     On August 27, 2013, Dr. Yacoub again tested positive for Cocaine and also tested positive for Oxycodone.

31.     On September 28, 2012, the following text messages regarding Dr. Yacoub's personal use were sent between Dr. Yacoub ((410) 627-6353) and Sandra Martin ((443) 226-8330):

- Dr. Yacoub:   I am in Md being driven by friend he will drop me off at the office then Maya will pick me up around 7 today is my birthday any chance of getting some good paint ??

- Martin:   Happy birthday sweetie but I'm broke

- Dr. Yacoub:   I have cash baby

- Martin:   I haven't paid him for the last yet

32.     Your Affiant is unaware of the street term paint, but based on the context of the conversation and your Affiant's training, knowledge and experience Dr. Yacoub and Martin are discussing CDS.

## PHARMACY SURVEYS

33.     Your Affiant has reviewed pharmacy records from Walmart Pharmacy,

Walgreens Pharmacy, CVS Pharmacy Stop and Shop Pharmacy, Rite Aid Pharmacy and Target Pharmacy. The records indicate that Dr. Yacoub's patients have filled prescriptions in the following states: New York, New Jersey, Arizona, Massachusetts, District of Columbia, California, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, North Carolina, Nevada, Pennsylvania, Oklahoma, Oregon, South Carolina, Texas, Virginia and West Virginia. Your Affiant knows through his training, knowledge and experience that doctors prescribing within the scope of legitimate medical practice typically have patients that reside in the same state as the medical practice. Your Affiant also knows that to prescribe controlled substances a doctor must examine a patient and have a doctor/patient relationship. Therefore, having numerous patients filling prescriptions in different states is a further indication that Dr. Yacoub is prescribing CDS outside the scope of normal medical practice.

## PATIENT FILES

34.    Your Affiant is seeking the seizure of numerous electronic and paper patient file. The bases for the seizure of the patient files is as follows:

- Based on the text messages and a review of subpoenaed pharmacy records Windy or Wendy Manning, DOB: 05-15-1983, Sandra Martin, DOB: 02-17-1953, Angela Delcostello, DOB: 09-27-1967, Margaret Delcostello, DOB: 02-23-1968, and Angela Martin, DOB: 09-27-1988 are alleged to be involved directly or indirectly with Dr. Yacoub to conspired to distribute CDS.

- Based on a review of subpoenaed pharmacy records Erz Minka, DOB: 08-28-1985, Jessica Rosson, DOB: 12-17-1984, Susan Pardew, DOB: 06-30-1959, Calliope Campbell, DOB: 06-28-1985, Donny Moorefield, DOB: 10-11-1976,

Donna Snier, DOB: 04-18-1966, and Suzan Schwing, DOB: 08-23-1963, have been identified as patients receiving CDS from Dr. Yacoub who are having the prescriptions filled in a state outside of Maryland.

- During Dr. Yacoub's interview with the Maryland Board of Physicians on April 19, 2013, Dr. Yacoub indicated that he had allegedly prescribed CDS to James Williams, DOB: 07-13-1973 and Chris Hatsel, DOB: 12-12-1968, outside the scope of legitimate medical practice.

- Jacques Yacoub or Khoury, DOB: 03-24-1985, is Dr. Yacoub's son and is filling CDS prescriptions purportedly prescribed by Dr. Yacoub. As a result, investigators believe that these prescriptions are outside the scope of legitimate medical practice.

## 729 CHARING TERRACE, TOWSON, MD 21204

35.      Dr. Yacoub lists 729 Charing Terrace, Towson, MD 21204 as his address on his Maryland Driver's License. On August 30, 2013, your Affiant and other law enforcement officers participating in this investigation conducted surveillance at 729 Charing Terrace, Towson, MD 21204. During the course of the surveillance, Dr. Yacoub was observed exiting the residence carrying a white trash bag. Dr. Yacoub discarded the trash bag in a dumpster near the residence. The dumpster is located outside the curtilage of Dr. Yacoub's property and is used by many members of the community. Law enforcement recovered the trash and found the following pertinent items:

- A US Airways baggage receipt bearing the name, Windy Manning;

- Two (2) Visa credit cards in the name, Windy Lou Manning;

- A handwritten note with the writing, Darius Johnson 10/08/1982;[1]

- An empty syringe bottle and an empty syringe bottle top inscribed Novotropin 10IU;[2] and

- Two (2) syringes with needles and one (1) needle.

36.     Your Affiant submits that Dr. Yacoub resides at 729 Charing Terrace, Towson, MD 21204, and that based on the above described facts and circumstances, and upon your Affiant's training, knowledge and experience, there is probable cause to believe that fruits, instrumentalities and evidence are kept and concealed within the residence.

### 6565 N. CHARLES STREET, SUITE 416, TOWSON, MD 21204

37.     Dr. Yacoub currently practices medicine at GBMC, located at 6565 N. Charles Street, Suite 416, Towson, MD 21204.  Law enforcement officers participating in this investigation have recently received information from legal staff at GBMC who confirmed the address of Dr. Yacoub's medical practice.  On July 1, 2013, during an interview with the Maryland Board of Physicians, Dr. Yacoub advised that his office is at the above listed address.

38.     Your Affiant knows based on his training, knowledge and experience that doctors typically keep either hard copy or electronic medical files at their practice location and that the medical files or lack thereof for specific patients of Dr. Yacoub is evidence of the illegal distribution of CDS.  During the course of the Maryland Board of Physicians interview on July 1, 2013, Dr. Yacoub advised that Windy Manning is a patient and that he has a medical record for her.  In addition your Affiant knows that

---

[1] Dr. Yacoub and Darius Johnson have exchanged several text messages.  On May 3, 2012, Dr. Yacoub sent Johnson the following text message "Greetings. My source has C. 20 For 14 a pill. Interested LMK".
[2] Novotropin is a human growth hormone.

doctors with DEA registration numbers, like Dr. Yacoub, can order CDS to be delivered to their business locations and store CDS at their business locations.

39.     Your Affiant submits that Dr. Yacoub's medical practice is located at 6565 N. Charles Street, Suite 416, Towson, MD 21204, and that based on the above described facts and circumstances, and upon your Affiant's training, knowledge and experience, there is probable cause to believe that fruits, instrumentalities and evidence are kept and concealed within the residence.

### 2211 SPARROWS POINT ROAD, BALTIMORE, MD 21219

40.     Sandra Martin lists 2211 Sparrows Point Road, Baltimore, MD 21219 as her address on her Maryland driver's license. On September 6, 2013, law enforcement established surveillance at 2211 Sparrows Point Road, Baltimore, MD 21219. During the course of surveillance law enforcement observed a white female exit the rear door of the residence with a young child. Law enforcement identified the female as Sandra Martin through comparison of an MVA photograph. In addition, on the same date a white male exited the rear door of the residence and entered a gold Chevrolet Suburban that was parked in the driveway of the location. After the vehicle departed the residence a traffic stop was conducted. The driver of the vehicle Ralph Paler advised the officer that he recently moved in with his girlfriend Sandra Martin and that they live at 2211 Sparrows Point Road.

41.     Although the text messages recovered from Saint Agnes Hospital only range from January 30, 2012 to October 4, 2012, your Affiant has reviewed current telephone toll records for Dr. Yacoub's cellular telephone number (410) 627-6353. These records indicate that from June 1, 2013 to August 25, 2013, Dr. Yacoub has had

274 contacts with cellular telephone number (443) 226-8330, believed to be used by Sandra Martin.  In addition, your Affiant has reviewed documents from Walgreen's pharmacy that indicate that as recently as August 24, 2013, Sandra Martin filled a prescription for 150 tablets of Methadone 10mg, which was prescribed by Dr. Yacoub.

42.     Your Affiant knows based on his training, knowledge and experience that those involved in the illegal diversion of pharmaceutical drugs typically keep and conceal within their residence: prescription pills, prescription forms, receipts, insurance documents, ledgers and other documents related to the illegal distribution of pharmaceutical controlled substances.

43.     Your Affiant submits that Sandra Martin resides at 2211 Sparrows Point Road, Baltimore, MD 21219, and that based on the above described facts and circumstances, and upon your Affiant's training, knowledge and experience, there is probable cause to believe that fruits, instrumentalities and evidence are kept and concealed within the residence.

## DR. YACOUB'S CELULAR TELEPHONE

44.     Cellular telephone number (410) 627-6353 is subscribed John Yacoub, M.D. PA, 6565 N. Charles St., Towson, MD 21204.  On July 1, 2013, during an interview with the Maryland Board of Physicians, Dr. Yacoub advised that his cellular telephone number is (410) 627-6353.   Based on the above-described facts and circumstances, Dr. Yacoub uses the cellular telephone to conduct and facilitate the illegal distribution of CDS.  In addition, based on the above described facts and circumstances, Dr. Yacoub stores text messages related to the illegal distribution of controlled substances on his cellular telephone.  As detailed above, Dr. Yacoub has had frequent

contact with Sandra Martin.

45.    Your Affiant submits that Dr. Yacoub's current cellular telephone is assigned telephone number (410) 627-6353, and that based on the above described facts and circumstances, and upon your Affiant's training, knowledge and experience, there is probable cause to believe that fruits, instrumentalities and evidence of possession with intent to distribute narcotics in violation of 21 U.S.C. § 841(a) are kept and concealed within the device.

## ELECTRONIC EVIDENCE

46.    Based on your affiant's training, knowledge and experience in the investigation of drug diversion, your affiant knows that those involved in the illegal distribution of CDS use computers to facilitate the conspiracy.  In fact, the text messages detailed above were downloaded from Dr. Yacoub's former company computer at Saint Agnes Hospital.

47.    Your affiant knows that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important aspects: (a) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (b) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are instrumentalities, fruits, or evidence of crime, or storage devices for information about crime.

48.    Based upon the facts set forth above, there is probable cause to believe

that computer hardware, software, related documentation, passwords, data security devices (as described below), were integral tools of these crimes and constitute the means of committing it.   As such, they are instrumentalities and evidence of the violations designated.   Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.   It is the intent of the agents to copy the electronic evidence at the search site (by creating a "mirrored" image of the data).   If this copying cannot be accomplished, then the computer evidence will be seized temporarily as more fully described below.

49.   Hardware: Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.   Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disks drives and diskettes, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, video display monitors, and related communications devices (such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

50.   Software: Computer software is digital information that can be interpreted by a computer and any of its related components to direct the way they work.   Software is stored in electronic, magnetic, or other digital form, including zip drives.   It commonly includes programs to run operating systems, applications (like tax preparation, word-processing, or spreadsheet programs), and utilities.

51.   <u>Documentation</u>: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

52.   <u>Passwords and Data Security Devices</u>: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or other programming code.  A password (a string of alphanumeric characters) usually operates a sort of digital key to unlock particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates test keys or hot keys, which perform certain preset security functions when touched.  Data security software or code may also encrypt, compress, hide, or booby-trap protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

53.   Based upon our knowledge, training and experience, and consultations with computer specialists from the Department of Health and Human Services, your affiant knows that searching and seizing information from computers almost always requires agents to seize most or all electronic storage devices (along with related peripherals, as discussed below) to be searched later by a qualified computer expert in a laboratory or other controlled environment.  This is true because of the following:

54.   <u>Volume of Evidence</u>: Computer storage devices (like hard disks, and diskettes) can store the equivalent of many thousands of pages of information.  Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to

examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

55. <u>Technical Requirements</u>: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. However, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

56. Based upon his knowledge, training and experience and consultations with forensic computer examiners, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

57. The peripheral devices which allow users to enter or retrieve data from the

storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system.  It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above.  In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

58.     If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

59.     Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime.  These include, but are not limited to, the following: examining file directories and subdirectories for the lists of files they contain; opening or reading the first few pages of selected files to determine their contents; scanning for deleted or hidden data; searching for key words or phrases ("string searches").

60.     This specifically excludes a search of any kind of unopened electronic mail, and no warrant is herein sought for such unopened electronic mail.  If unopened electronic mail is to be searched, a separate warrant will be sought supported by probable cause.

## DATA WAIVED PATIENT MEDICAL RECORDS

61.     Your Affiant seeks an Order authorizing investigators to obtain specific DATA-Waived patient medical records, maintained by Dr. John K. Yacoub, to the extent these records are included in the materials sought by the search warrant.

### Background

62.     Though all physicians and treatment facilities are subject to strict rules regarding confidentiality of patient records, authorized substance abuse treatment programs are more highly regulated and subject to special restrictions and requirements as set forth in Title 21 and 42 of the United States Code and the Code of Federal Regulations.   Title 42, U.S.C. § 290dd-2(a) provides for the confidentiality of patient records relating to substance abuse treatment in programs which receive federal assistance ("DATA Waived Patient Records").   Title 42, U.S.C. § 290dd-2(b)(2)(C) states that records relating to substance abuse treatment may be released without the patient's consent upon entry by the Court of an appropriate order.   Regulations interpreting and implementing the above statutory provisions are promulgated at 42 C.F.R. Part 2.   These regulations permit the Court to authorize the disclosure of patient records relating to substance abuse treatment in certain circumstances.

63.     Records of the identity, diagnosis, prognosis, and treatment of drug treatment patients are required to be kept confidential. *See* 21 C.F.R. § 1304.24(d), 42 U.S.C. § 290dd-2(a).   Section 2.66 of Title 42 of the Code of Federal Regulations allows law enforcement to seek court authorization for the disclosure and use of records to investigate or prosecute a program or the person holding the records.   These records can only be obtained if the court determines that good cause exists.   To make this

determination the court must find that:

    a. Other ways of obtaining the information are not available or would not be effective; and

    b. The public interest and need for the disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services.

In addition, an order authorizing a disclosure of DATA-Waived patient materials must:

    a. Limit disclosure to those parts of the patient's record which are essential to fulfill the objective of the order;

    b. Limit disclosure to those persons whose need for information is the basis for the order; and

    c. Include such other measures as are necessary to limit disclosure for the protection of the patient, the physician-patient relationship and the treatment services; for example, sealing from public scrutiny the record of any proceeding for which disclosure of a patient's record has been order.

42 C.F.R. § 2.66(c)

## Basis for Request

64.    As noted previously, Dr. Yacoub is believed to be involved with possible prescribing and distribution of controlled substances for illegitimate medical purpose, outside the course of his professional practice. However, since Dr. Yacoub is authorized to use certain drugs to treat the drug addictions of his patients, and Dr. Yacoub has mentioned in an interview with the Maryland Board of Physicians, that Windy Manning is a "detox patient" (DATA-Waived patient), there is potential that during a Search Warrant, law enforcement may need to review and obtain potential DATA-Waived patient records maintained by Dr. Yacoub. For this reason, court authorization pursuant to 42 C.F.R. § 2.66 are being sought in an abundance of caution, though it is the belief of your Affiant, based on previous requests for patient records by the Maryland Board of Physicians, that the majority, if not all the specific patient records being acquired from

Dr. Yacoub, will not be related to his DATA-Waive registration, or the patient records will not exist due to Dr. Yacoub not having a proper doctor-patient relationship.

65.     At present, your Affiant believes that obtaining these patient medical records is the only way to confirm that Dr. Yacoub is continuing to illegally prescribe controlled substances to people who have and have not been patients of Dr. Yacoub. Surveys of pharmacies in the area can be a useful tool in establishing the prescribing patterns of Dr. Yacoub, however, pharmacy surveys cannot confirm whether those prescriptions are written for a legitimate medical purpose nor verify that the people Dr. Yacoub prescribes for, are actual patients or just people for whom Dr. Yacoub illegally writes prescriptions.

66.     Moreover, to the extent any such records are obtained, public interest in the criminal investigation related to Dr. Yacoub and the need for the disclosure of the records related to that investigation outweigh the potential injury to the patient, the physician-patient relationship and the treatment services. Your Affiant has learned that the Medical Board intends to suspend or revoke Dr. Yacoub's medical license. As a result, obtaining the records is unlikely to cause any additional injury to his patients or services.

67.     For the foregoing reasons, it is the belief of your Affiant that obtaining specific DATA-Waived patient records from Dr. Yacoub is warranted. Since certain possible patients of Dr. Yacoub's, with whom he has had improper relationships and to whom he has prescribed controlled substances, may be receiving drug treatment, your Affiant is requesting formal court approval authorizing disclosure and use of records in connection with this investigation.

68.     The requested authorization to obtain DATA-Waived patient records in investigating Dr. Yacoub's prescribing practices is sought to be served at the same time as a search warrant of Dr. Yacoub's residence and office and a subpoena seeking the same materials as the search warrant. Patient identifying information will not be revealed or otherwise disclosed unless absolutely necessary to criminally investigate or prosecute those engaged in the illegal distribution of drugs. All measures will be taken to limit any potential disruption for a real or apparent break of patient confidentiality.

69.     Since Dr. John K. Yacoub is the subject of a criminal investigation, it is requested that the notice not be required pursuant to 42 C.F.R. § 2.66(b), if deemed applicable, be granted, and the Court's order be served without notice.

70.     Attached for the Court's consideration is a proposed Order.

## CONCLUSION

71.     Your Affiant believes that based on the above described facts and circumstances, and upon your affiant's training, knowledge and experience, there is probable cause to believe that fruits, instrumentalities and evidence, as described in ATTACHMENT E, of violations of:

- Title 21 U.S.C. § 846 – Conspiracy to Distribute Oxycodone, Oxymorphone, Morphine, Methadone and Alprazolam and Possess with Intent to Distribute; and

- Title 21 U.S.C. § 842(a)(2) – Improper use of a DEA registration number;

are kept and concealed within the following locations:

- Dr. John Yacoub's residence located at 729 Charing Terrace, Towson, MD 21204, which is more fully described in the attached "ATTACHMENT A";

- Dr. John Yacoub's medical office located at 6565 N. Charles Street, Suite 416, Towson, MD 21204, which is more fully described in the attached "ATTACHMENT B";

KSC

**13-2261TJS thru 13-2265TJS**

- Sandra Martin's residence located at 2211 Sparrows Point Road, Baltimore, MD 21219, which is more fully described in the attached "ATTACHMENT C"; and

- Dr. John Yacoub's cellular telephone, which is more fully described in the attached "ATTACHMENT D."

As a result, your Affiant believes that concealed in the SUBJECT PROPERTIES and SUBJECT CELLUAR PHONE are fruits, instrumentalities and evidence of the above violations.

Signed and sworn to this ___17___ day of September 2013

_____
E Troy Yeager
DHHS-OIG Special Agent

Subscribed and sworn to before me this ___19th___ day of September 2013

_____
Timothy J. Sullivan
United States Magistrate Judge

KSC **13-2261TJS** *thru* **13-2265TJS**

## ATTACHMENT A

### DR. JOHN YACOUB'S RESIDENCE: 729 CHARING TERRACE, TOWSON, MD 21204

**729 Charing Terrace, Towson, MD 21204** is described as an attached townhouse/apartment in a rental community. The building is an off-white stucco on the top half and brown on the lower half. The front door is blue with a gold knocker, dead bolt lock and door handle. To the left of the front door attached to the wall is a black mailbox and the numbers "729" in gold letters. The following are photos of the property.





**ATTACHMENT B**

### DR. JOHN YACOUB'S MEDICAL PRACTICE: 6565 N. CHARLES STREET, SUITE 416, TOWSON, MD 21204

**6565 N. Charles Street, Suite 416, Towson, MD 21204** is located at Greater Baltimore Medical Center ("GBMC") in the Physicians Pavilion East. The medical practice is located on the fourth floor. From the elevator the medical practice is located at the end of the hallway on the right hand side. The front door of the medical practice is brown wood with a gold handle, deadbolt lock and mail slot. To the right of the front door is a glass wall. Attached to the glass wall is a grey sign with the numbers "416" and the name John K. Yacoub, M.D. in white letters. The following are photos of the property.





KSC

**13-2261TJS** *thru* **13-2265TJS**

## ATTACHMENT C

### SANDRA MARTIN'S RESIDENCE:  2211 SPARROWS POINT ROAD, BALTIMORE, MD 21219

**2211 Sparrows Point Road, Baltimore, MD 21219** is described as a single-family red brick residence located on the corner of Sparrows Point Road and Lakeview Avenue. The front door is brown wood with a gold knocker. Attached to the residence on the left hand side is a white placard with the numbers "2211" in gold. The following are photos of the property.





## ATTACHMENT D

### DR. YACOUB'S CELLULAR TELEPHONE:  (410) 627-6353

**(410) 627-6353, IMSI# 310260565275461** is subscribed John Yacoub, M.D. PA, 6565 N. Charles St., Towson, MD 21204.  On July 1, 2013, during an interview with the Maryland Board of Physicians Dr. Yacoub advised that his cellular telephone number is (410) 627-6353.

Cellular telephone (410) 627-6353 shall be searched according to the protocol listed on Attachment F for the following items: telephone numbers, names, addresses, email addresses, opened and unopened voicemail messages, text or SMS messages, email, bank/financial records, travel records, shipment records, location information, or photos/videos.

KSC        **13-2261TJS** *thru* **13-2265TJS**

## ATTACHMENT E

### ITEMS TO BE SEARCHED FOR

1.      Any documents that evidence or relate to the offenses described in the warrant including Conspiracy and Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841, 846. These materials will included but not be limited to prescriptions, prescription pads, insurance cards, drug discount cards, invoices, bills, medical billing and coding materials, records of prescription drug dispensing, and any evidence of the proceeds of such offenses.

2.      Books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances, in particular, prescription medication, and for records, images and items revealing relationships between organization members.

3.      Books, records, receipts, bank statements and records, passbooks, letters of credit, money orders and cashiers' checks, safe deposit keys, items of storage such as safes and lock boxes, international money wires/transfers and other items evidencing the obtaining, secreting, transfer, concealment and/or the expenditure of money.

4.      Address and/or telephone books, any papers reflecting names, addresses, telephone numbers or pager numbers indicating relationships among the listed co-conspirators in the affidavit which are associated with the dealing of illegal controlled substances.

5.      United States currency, precious metals, jewelry and financial instruments, as well as evidence of the acquisition of property and other assets, including but not limited to real estate, stocks, bonds and other types of financial investments, vehicles and other tangible goods.

6.      Photographs, in particular, photographs of co-conspirators, of assets, firearms and/or controlled substances.

7.      Indicia of occupancy, residency, and ownership of the premises described in said affidavit, including, but not limited to, utility and telephone bills, canceled envelopes, and keys.

8.      Cellular phones, pagers, beepers, or other electronic communications devices.

9.      Computer hardware, software, documentation, passwords, and data security devices.

10.     Travel records, including but not limited to: passports, visas, airline tickets, boarding passes, and airline ticket receipts.

11.    Controlled substances, including but not limited to prescription medication, scales, packaging materials used to package cut, dilute or package prescription medication and any other controlled substances and their related paraphernalia.

12.    The electronic and paper patient files of:

Windy or Wendy MANNING, DOB: 05-15-1983
Sandra MARTIN, DOB: 02-17-1953
Angela DELCOSTELLO, DOB: 09-27-1967
Erz MINKA, DOB: 08-28-1985
Jessica ROSSON, DOB: 12-17-1984
Susan PARDEW, DOB: 06-30-1959
Calliope CAMPBELL, DOB: 06-28-1985
Donny MOOREFIELD, DOB: 10-11-1976
Donna SNIER, DOB: 04-18-1966
James WILLIAMS, DOB: 07-13-1973
Margaret DELCOSTELLO, DOB: 02-23-1968
Angela MARTIN, DOB: 09-27-1988
Jacques YACOUB or KHOURY, DOB: 03-24-1985
Suzan SCHWING, DOB: 08-23-1963
Chris HATSEL, DOB: 12-12-1968

KSC **13-2261TJS** through **13-2265TJS**

## ATTACHMENT F
### Search Protocols – Subject Cellular Telephone

This warrant authorizes the search of electronically stored information and other documents related to the item listed on Attachment D.

Because of the possibility that the files examined pursuant to the warrant will include information that is beyond the scope of what the United States has demonstrated the existence probable cause to search for, the search shall be conducted in a manner that will minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed.

While this protocol does not prescribe the specific search protocol to be used, it does contain limitations to what government investigators may view during their search, and the searching investigators shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted, pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment D hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that the government investigators conducting the search will view information that is beyond the scope for which probable cause exists.

The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

a.     Use of computer search methodology to conduct an examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

b.     Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

c.     Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein; and

d.     Opening or reading portions of files that are identified as a result of conducting digital search inquiries in order to determine their relevance.